## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTINA MCMULLEN, | ) | CASE NO. 1:23-CV-00118-JPC |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| v. | ) | J. PHILIP CALABRESE |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | U.S. MAGISTRATE JUDGE |
| SECURITY, | ) | JENNIFER DOWDELL ARMSTRONG |
| | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

### I. INTRODUCTION

Plaintiff Christina McMullen ("Ms. McMullen") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner) denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI.") U.S. District Judge J. Philip Calabrese has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

### II. PROCEDURAL HISTORY

Ms. McMullen filed applications for DIB and SSI on February 11, 2021, alleging a disability onset date of January 16, 2020. Ms. McMullen's applications related to anxiety, post-traumatic stress disorder (PTSD), depressive disorder, spine disorders, asthma, and peripheral neuropathy. (Tr. 220-31.)[1] Her applications were denied initially and upon reconsideration. (Tr.

---

[1] The administrative transcript ("Tr") appears at ECF No. 6 on CM/ECF.

130-39, 142-49.) On April 12, 2022, an ALJ held a telephonic hearing due to the COVID-19 pandemic where Ms. McMullen, represented by counsel, and a vocational expert ("VE") testified. (Tr. 14-65.) The ALJ issued a written decision on May 13, 2022, finding that Ms. McMullen was not disabled under the Social Security Act. (Tr. 17-36.) The ALJ's decision became final on December 22, 2022, when the Appeals Council declined further review. (Tr. 1-8.) On January 23, 2023, Ms. McMullen filed a Complaint, challenging the Commissioner's final decision. (ECF No. 1.) She raises the following assignments of error:

> (1) Was the ALJ's RFC finding supported by the evidence and the rejection of the Plaintiff's treating physician's opinion legally sufficient?
>
> (2) Did the ALJ fail to follow SSR 16-3p and SSR 96-8p in discrediting Claimant without proper support?

(ECF No. 7, PageID#2191.)

## III.    BACKGROUND INFORMATION

### A. *Personal, Educational, and Vocational Experience*

Ms. McMullen was born in 1975, and she was 44 years old on the alleged disability onset date. (Tr. 34.) She has at least a high school education. (*Id.*; *see* Tr. 2119.) She lives with her children. (*See* Tr. 265.) Her past relevant work was employment as a nurse assistant and home attendant. (Tr. 34.)

### B. *Relevant Statements and Hearing Testimony*

#### 1.  **Ms. McMullen's Function Report**

Ms. McMullen reported that she lives with her children and spends her day going from the bed to the couch or bathroom. (Tr. 265.) She stated that her conditions prevent her from sleeping. (*Id.*) She reported difficulty with self-care, stating that she cannot stay focused and only changes her clothes approximately once or twice a week. (*Id.*) She also stated that she will only bathe one

time a week because she cannot stay focused while bathing and wants to sleep in the bath. (*Id.*) She said she barely eats and that, while she is able to use the toilet, she may have "accidents on [her]self." (*Id.*) She noted that she stopped cooking due to problems with her memory, and she stated that her anxiety and memory deficits also preclude her from handling her finances. (Tr. 266-27.) She indicated that she needed reminders to attend to her personal needs, take her medications, and go places. (Tr. 266, 268.) She noted that she rarely goes outside due to anxiety and fear, and she needs someone to accompany her when she does go out. (Tr. 267.) She reported that, due to her anxiety, she has difficulty socializing with others and has "isolated [her]self from the outside world." (Tr. 268.) She further reported that her conditions affect her memory, completing tasks, concentration, understanding, following written or spoken instructions, and getting along with others. (Tr. 269-70.) She reported she cannot handle stress or changes in routine. (Tr. 270.) She also reported an unusual fear of death, danger, or that "someone is gonna kill [her]." (*Id.*)

### 2. <u>Ms. McMullen's Hearing Testimony</u>

Ms. McMullen testified that she was socially isolating due to her agoraphobia, not the COVID-19 pandemic. (Tr. 48-49.) She stated that it was her understanding that she had a phobia, depression, and anxiety. (Tr. 49.)

The ALJ asked Ms. McMullen about her carpal tunnel syndrome. (Tr. 50.) Ms. McMullen admitted that she had not sought treatment for this condition, but she stated that she wears braces during the day to deal with the swelling and tingling of her hands. (Tr. 50-51.)

Ms. McMullen testified that she has pain in her legs, hips, back, arms, and hands. (Tr. 51.) She stated this pain travels between her back, down her legs, and into her feet. (*Id.*) When this pain reaches her feet, she experiences tingling, burning, and throbbing sensations in her feet. (Tr. 51-52.) She stated that the throbbing causes her to only remain on her feet for five minutes before

needing to lie down. (Tr. 52.) She noted that sitting in a regular chair caused her to experience pain from her back down to her legs, so she mainly sits in a recliner. (Tr. 52-53.) Ms. McMullen stated that she experiences pain, numbness, and tingling in her hands when brushing her hair and teeth. (Tr. 53-54.)

Regarding her mental health, Ms. McMullen testified that she experiences panic and depression prior to and after leaving her home. (Tr. 54-56.) She explained that her anxiety increases the closer the date comes to when she must leave her home. (Tr. 54-55.) She testified that when she is out of the house, her nerves are in a knot, her heart races, and she cannot wait to go home. (Tr. 55.) She also stated that she isolates herself in her bedroom while at home and  cannot sit down to eat a meal with her children, which has negatively impacted her relationship with her family. (Tr. 56.) She stated that she has temperament issues. (*Id.*) She endorsed that she does not get along well with others due to her anxiety, depression, and temper. (*Id.*)

Ms. McMullen testified that she takes Neurontin and Lyrica for her conditions. (Tr. 59.) She further stated that she only goes out a "couple of times a month" for appointments. (*Id.*) Her children typically go grocery shopping. (*Id.*)

### 3. <u>Vocational Expert's Hearing Testimony</u>

The ALJ asked the VE whether an individual with Ms. McMullen's age, education, and vocational background could perform work at the light exertional level, except she could frequently climb ramps and stairs; could occasionally climb ladders, ropes, or scaffolds; could frequently kneel, crouch, or crawl; could occasionally stoop; has no limitation in balancing; must avoid concentrated exposure to pulmonary irritants; can perform short cycle tasks, at a consistent pace, in a setting where she is not expected to meet strict production demands or concentrate for extended periods; can interact with others superficially on an occasional basis; can work within a

set routine where major changes are explained in advance and gradually implemented to allow her to adjust to the new expectations; and her ability to handle routine stress and pressure in the workplace is adequate to handle tasks without time limitations or strict productions standards. (Tr. 62.) The VE opined that this individual could not perform past work, but the individual could perform work as a marker, mail clerk, and housekeeping cleaner. (Tr. 62-63.)

The VE stated that the off-task tolerance for these jobs would be no more than 10%. (Tr. 64.) The VE opined that most employers would tolerate one to two absences in a month, but not on a consistent basis. (*Id.*) The VE explained that an employer would tolerate a maximum of six absences per year. (*Id.*)

### C.  *Relevant Medical/Non-Medical Opinion Evidence*

#### 1.  <u>State Agency Opinions</u>

##### a.  **State Agency Medical Consultants**

Robert A. Klinger, M.D., reviewed Ms. McMullen's record at the initial level of consideration on May 14, 2021. Dr. Klinger opined that Ms. McMullen can work at the light exertional level, except she is limited to frequent climbing of ramps and stairs; occasional climbing of ladders, ropes, or scaffolds; unlimited balancing; occasional stooping; frequent kneeling, crouching, and crawling; and avoidance of concentrated exposure to pulmonary irritants. (Tr. 95-96.) W. Scott Bolz, M.D., affirmed Dr. Klinger's opinions at the reconsideration level on August 31, 2021. (Tr. 113-14.)

##### b.  **State Agency Psychological Consultants**

Karla Delcour, Ph.D., reviewed Ms. McMullen's record at the initial level of consideration on April 26, 2021. Dr. Delcour adopted a previous ALJ's findings that Ms. McMullen can perform short cycle tasks at a consistent pace in a setting where she is not expected to meet strict production

demands or concentrate for extended periods; can interact with others superficially on an occasional basis; can work within a set routine where major changes are explained in advance and gradually implemented to allow her time to adjust to the new expectations; and her ability to handle routine stress and pressure in the workplace would be reduced, but adequate to handle tasks without strict time limitations or strict productions standards. (Tr. 97.) Ms. Jennifer Swain reviewed the file at the reconsideration level on July 31, 2021, and she affirmed Dr. Delcour's opinion. (Tr. 112, 115.)

### 2.  Nicole Pavella, APN

Nurse Pavella completed a Mental Medical Source Assessment for Ms. McMullen. (Tr. 1411-13.) In a series of check boxes, Nurse Pavella assessed Ms. McMullen's mental limitations. (*Id.*) Regard Ms. McMullen's understanding and memory limitations, Nurse Pavella opined that Ms. McMullen is unable to perform the following tasks on a regular, reliable, and sustained schedule: remember locations and work-like procedures; understand and remember very short, simple instructions; and understand and remember detailed instructions. (Tr. 1411.)

With respect to Ms. McMullen's sustained concentration and persistence limitations, Nurse Pavella opined that Ms. McMullen is also unable to, on a regular, reliable, and sustained schedule, carry out very short and simple instructions; carry out detailed instructions; maintain attention and concentration for extended periods of time; perform activities within a schedule, maintain regular attendance, and/or be punctual within customary tolerances; sustain ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pact without an unreasonable number and length of rest periods. (*Id.*)

Regarding Ms. McMullen's social interaction limitations, Nurse Pavella opined that Ms. McMullen is unable to, on a regular, reliable, and sustained schedule, interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Tr. 1411-12.)

Regarding Ms. McMullen's adaptation limitations, Nurse Pavella opined that Ms. McMullen is unable to, on a regular, reliable, and sustained schedule, respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (Tr. 1412.)

Nurse Pavella also opined that Ms. McMullen would be absent more than four days per month due to her impairments. (*Id.*) Nurse Pavella then opined that Ms. McMullen would be more than 20% off task throughout an 8-hour workday. (*Id.*) As support for Nurse Pavella's opinions, Nurse Pavella wrote: "P[a]t[ient] is d[iagnosed] with PTSD, GAD, bipolar [disorder], panic [disorder], and agoraphobia. Many of these d[iagnoses] are based off of p[atient's] reported symptoms that she has been unable to manage thus far which has been reportedly debilitating." (Tr. 1413.) When asked to discuss any other information relevant to the decision regarding whether Ms. McMullen can maintain full-time employment, Nurse Pavella wrote that Ms. McMullen has a medical diagnosis "causing chronic pain which worsens mental disorders." (*Id.*)

### D. *Relevant Medical Evidence*

Prior to the relevant period, Ms. McMullen was diagnosed with generalized anxiety disorder, depressive disorder, and PTSD. (Tr. 452-61, 558-605, 703-07, 926-75.) On January 31,

2020, Ms. McMullen went to the emergency room for tachycardia and anxiety disorder. (Tr. 307.) She reported that she felt "shaky" while driving her kids to school. (Tr. 327.) Approximately an hour later, she began to feel like her heart was beating fast and pounding in her chest. (*Id.*) Emergency services noted that Ms. McMullen initially had an elevated heart rate of 125, but her heart rate returned to normal by the time she returned to the emergency room. (Tr. 331.) Upon examination, Ms. McMullen had supple and nontender neck; lungs clear to auscultation with no rales, rhonchi, or wheezing; regular heart rate and rhythm with no murmurs, gallops, or rubs; soft, nondistended abdomen with no tenderness; well-perfused and warm extremities without peripheral edema; palpable pulses in both feet; no calf tenderness; and was cooperative. (Tr. 329.)

On February 14, 2020, Ms. McMullen attended a virtual appointment with Hardeepak Shah, M.D., for complaints of chronic fatigue and upper respiratory symptoms for the last two weeks. Ms. McMullen indicated that Albuterol provided relief for her mild wheezing, and she denied shortness of breath. (Tr. 404.) Dr. Shah observed that Ms. McMullen was happy, smiling, and interactive. (Tr. 405.) He indicated that Ms. McMullen's breathing was non-labored, and he noted that she had no obvious neurological deficit. (Tr. 405.) Dr. Shah diagnosed Ms. McMullen with mild intermittent asthma without complication and bacterial sinusitis. (*Id.*)

In April 2020, Ms. McMullen saw Denise Flynn, A.P.N., for complaints of anxiety with panic attacks and agoraphobia. (Tr. 606-611.) Ms. McMullen reported extreme anxiety related to COVID-19 and social isolation since the start of the pandemic, sleep difficulties with nightmares, flashbacks, and a decreased appetite. (Tr. 607, 611.) She denied a history of psychiatric hospitalizations. (Tr. 611.) Nurse Flynn's mental status examination notes indicate Ms. McMullen was casually dressed with uncombed hair, cooperative, and pacing at home during the video call. (Tr. 608.) The mental status examination also revealed Ms. McMullen had depressed mood with

anxiety, normal speech, obsessive and tangential thought processes, loose associations, normal thought content, normal recent memory, limited insight, and fair judgment. (*Id.*) Ms. McMullen reported poor, "spaced out" concentration, but Nurse Flynn observed that Ms. McMullen was alert and fully oriented. (*Id.*) Nurse Flynn noted that Ms. McMullen had not been taking her medications as prescribed and made no changes to her medication regimen. (Tr. 611.)

Ms. McMullen attended another virtual psychiatric appointment with Nurse Flynn on May 22, 2020. Upon mental status examination, Ms. McMullen was oriented x4; alert with self-reported poor concentration (described as "spaces out"); had depressed mood with anxiety; had normal, spontaneous speech; had normal language; had obsessive and tangential thought process; had loose associations; had normal recent memory; had limited insight; and had fair judgment. (Tr. 613-14.) Nurse Flynn prescribed Rexulti. (Tr. 615.) Ms. McMullen reported extreme anxiety and social isolation related to COVID-19; being unable to leave the house or go anywhere in a car even as a passenger "since [the] start of stay at home orders"; and that her daughters had been buying her groceries. (Tr. 616-17.)

On June 26, 2020, Ms. McMullen saw Jacquelynn M. Shank, PA-C, via telephone. She reported abdominal pain that she described as feeling bloated and like she was "[eight] months pregnant." (Tr. 394.) Ms. McMullen had another telephone appointment with PA Shank on August 25, 2020. She reported that she felt like her legs were "constantly feeling like they [were] moving" and aching pain like "she has been walking on them all day." (Tr. 390.) She stated that she feels tingling on occasion, and that pain tends to occur on a daily basis with no known aggravating/exacerbating factor. (*Id.*) She stated that while the symptoms are still present, her symptoms were "slightly less severe since starting [G]abapentin." (*Id.*) Baclofen was helpful for

her charley horses.[2] (*Id.*) She reported using a TENS unit two to three times per day. (*Id.*) PA Shank diagnosed Ms. McMullen with pain in both lower extremities, chronic bilateral low back pain without sciatica, and dyshidrosis.[3] (Tr. 391.)

On September 14, 2020, Ms. McMullen saw Amanda Collins, LPCC, a therapist, for mental counseling. (Tr. 466.) She reported symptoms to Ms. Collins, including feeling overwhelmed, irritable, having difficulty sleeping and focusing, and experiencing increased anxiety with agoraphobia due to the pandemic. (Tr. 466.) Ms. McMullen considered increasing her mental health medications, but Ms. Collins discouraged her from making those adjustments without a doctor's consent. (*Id.*) Ms. McMullen reported her symptoms started in childhood after she was the victim of abuse. (*Id.*) She stated that she felt like her mother was never supportive, and they continue to have a strained and dysfunctional relationship. (*Id.*) The mental status examination revealed overwhelmed behavior/attitude, a tearful mood/affect, normal speech, and no suicidal/homicidal ideation. (Tr. 462-63.)

Ms. McMullen telephonically attended a mental counseling appointment with Tiera Cross, L.P.C., on September 25, 2020. Ms. McMullen reported to Ms. Cross that she felt very overwhelmed by current life stressors building on top of past unprocessed traumas and having no coping skills. (Tr. 481.) She stated she would like to attend therapy multiple times per week. (*Id.*)

At an October 13, 2020, mental health counseling appointment, Ms. McMullen reported to Ms. Cross that she was feeling "relieved." (Tr. 486.) She had to attend court recently and the

---

[2] A "charley horse" is the common name for a muscle spam or cramp typically in one's legs. *See Muscle Cramp*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/muscle-cramp/symptoms-causes/syc-20350820 (last visited Dec. 6, 2023).

[3] Dyshidrosis is a "skin condition that causes small, fluid-filled blisters to form on the palms of the hands and sides of the fingers." *Dyshidrosis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/dyshidrosis/symptoms-causes/syc-20352342#:~:text=Dyshidrosis%20is%20a%20skin%20condition,weeks%20and%20often%20come%20back. (last visited Dec. 6, 2023.)

judgment was in her favor. (*Id.*) She stated the stress of the situation was impacting her sleep and she "slept through the night" when the court day concluded.  (*Id.*)

On October 19, 2020, Ms. McMullen saw Ms. Cross for another mental health counseling appointment. (Tr. 491.) Ms. McMullen reported feeling a "little less" anxiety and that she was trying to give her medication adjustment time to work. (*Id.*) She stated that she was finally able to sleep without waking up multiple times per night, and that this increase in sleep made a difference in her moods throughout the day. (*Id.*) Ms. McMullen, however, also reported that she still struggles to remain focused to accomplish daily tasks or be motivat to be social with others. (*Id.*) The mental status examination revealed cooperative behavior/attitude, anxious mood/affect, and normal speech/language. (Tr. 487-88.)

On October 21, 2020, Ms. McMullen saw PA Shank virtually for upper respiratory symptoms. (Tr. 381-89). She reported using a rescue inhaler daily for asthma, but she denied a history of asthma-related hospitalizations. (Tr. 382.) PA Shank indicated that Ms. McMullen appeared tired, but with non-labored breathing and normal respiratory effort. (Tr. 384.)

Two days later, Ms. McMullen saw PA Shank virtually for a follow-up appointment regarding her leg pain. (Tr. 374-80.) Ms. McMullen reported that her feet felt "broke" and like she was "walking on softballs." (Tr. 374.) She also noted, however, that her nerve pain medication helped some of her symptoms. (*Id.*) She saw a vascular physician who believed neuropathy to be the possible cause of her symptoms and recommended compression stockings, but PA Shank noted that Ms. McMullen had not started use of compression stockings at the time of the appointment. (*Id.*) Ms. McMullen reported that rainy weather was recently aggravating her legs. (*Id.*) Ms. McMullen was not currently using the TENS unit because she did not have pads. (*Id.*) PA Shank described Ms. McMullen as appearing tired and anxious, though she remained alert and

appropriate. (Tr. 377.) The video examination revealed decreased range of motion in her back due to pain, but no obvious neurologic deficit. (*Id.*) PA Shank noted that Ms. McMullen did not want to take the oral medications PA Shank suggested; however, Ms. McMullen said she was willing to try a topical nerve pain medication. (*Id.*) The same month, Ms. McMullen saw Dr. Shah for complaints of continued pain in her legs and feet. (Tr. 1297.) Dr. Shah did not include physical examination findings, but he prescribed a different nerve pain medication at Ms. McMullen's request. (Tr. 1297-98.)

At a November 7, 2020, telephone counseling appointment, Ms. McMullen reported that she felt very anxious and fearful about leaving the house, was often paranoid, and was emotionally and mentally worn out from her anxiety. (Tr. 496.) She stated that her son was also staying confined to the house and was unwilling to leave. (*Id.*) Mental status examination findings revealed that Ms. McMullen had cooperative behavior/attitude, anxious mood/affect, and normal speech/language. (Tr. 492-93.)

On November 11, 2020, Ms. McMullen had a virtual appointment with Nimish Thakore, M.D., a neurologist, for complaints of leg pain that felt like the bones in her feet were broken and that she was walking "on softballs." (Tr. 1284.) She also reported a loss of sensation and temperature changes in her feet. (*Id.*) She described her balance as "so-so" and denied falls. (Tr. 1284.) She reported pain rated eight to nine out of 10 when the rain "is off the cha[r]ts." (*Id.*) She reported back pain that radiated down her legs, but she did not want any injections in her back. (Tr. 1284-85.) Dr. Thakore could only conduct a limited examination due to technical issues with the video connection. (Tr. 1285.) However, Dr. Thakore noted that Ms. McMullen was ambulatory and had coordinated movements of her hands. (*Id.*) He ordered testing and imaging of the spine. (*Id.*) Dr. Thakore assessed Ms. McMullen with chronic widespread pain, very chronic distal

12

symptoms in her legs "reminiscent of polyneuropathy," low back pain, some suggestion of claudication (without excluding lumbar canal stenosis), some associations of pain in keeping with restless leg syndrome, and underlying anxiety. (*Id.*)

On November 12, 2020, Ms. McMullen saw Dr. Shah virtually. (Tr. 1282-83.) She reported that she was doing "fair" and weaning off Gabapentin, one of her nerve pain medications. (Tr. 1283.) Dr. Shah advised Ms. McMullen to wean off Gabapentin and to increase Lyrica. (*Id.*) Ms. McMullen saw Dr. Shah virtually on November 27, 2020, for her sinus symptoms. (Tr. 1281.) She reported her asthma was "okay," and Dr. Shah observed that her breathing was non-labored. (*Id.*) Dr. Shah indicated that Ms. McMullen's asthma was mild, intermittent, and stable without complication. (*Id.*) At a November 19, 2021, neurology office visit, Ms. McMullen took a PHQ-9 depression test, which assessed Ms. McMullen with severe depression. (Tr. 1465.)

Mental status examination findings from November 20, 2020, reveal that Ms. McMullen had cooperative behavior/attitude, appropriate affect, and normal speech/language. (Tr. 497-98.) Mental status examination findings from November 24, 2020, reveal that Ms. McMullen had cooperative behavior/attitude, anxious mood/affect, and normal speech/language. (Tr. 502-03.) On November 29, 2020, Ms. McMullen attended a telephone counseling appointment with Ms. Cross. (Tr. 501.) Ms. McMullen reported that she was frustrated that her mother was "up to her same spiteful behavior." (*Id.*) Ms. McMullen acknowledged that she felt her anxiety is "rubbing off on her son," but she does not know how to resolve this issue. (*Id.*) She also reported that she has been trying to avoid everyone "unless it is a necessary task." (*Id.*)

On November 30, 2020, Ms. McMullen reported increasing anxiety due to the increase in COVID-19 numbers and feeling "very afraid" to leave the house. (Tr. 506.) She reported that she was continuing to have issues with her family relationships. (*Id.*) Mental status examination

findings from December 1, 2020, reveal that Ms. McMullen had appropriate affect and normal speech/language. (Tr. 507-08.)

Ms. McMullen attended a virtual appointment with Dr. Shah on December 8, 2020, where she reported that her nerve medication helped her feet, but not her legs. (Tr. 1271.) She did not want to increase her nerve medication. (*Id.*) Upon video examination, Ms. McMullen was alert and appropriate, in no distress, happy, smiling, and interactive. (*Id.*) Dr. Shah described Ms. McMullen's breathing as non-labored, and her asthma as stable. (Tr. 1271-72.)

Ms. McMullen had a virtual counseling session with Ms. Cross via telephone on December 13, 2020. (Tr. 511.) Ms. McMullen reported that she recently had multiple arguments with her oldest daughter. (Tr. 511.) She insisted that she did not know why "people have been coming out of nowhere saying rude things to her and wanting to argue." (*Id.*) She stated that she felt like she has no one "in her corner" at that time. (*Id.*) Mental status examination findings from December 17, 2020, revealed that Ms. McMullen had cooperative behavior/attitude, appropriate affect, and normal speech/language. (Tr. 512-13.)

Mental status examination results from February 1, 2021, revealed that Ms. McMullen was alert and self-reported poor, "spaced out" concentration; had depressed mood with anxiety; had normal language and speech; had obsessive and tangential thought process; had loose associations; had normal memory; had limited insight; had fair judgment; and denied hallucinations, delusions, and suicidal or homicidal ideations. (Tr. 944-45.)

On February 7, 2021, Ms. McMullen attended a telehealth mental health counseling session with Kelly Christy, LPCC. (Tr. 536.) Ms. McMullen reported that she needed to follow up with her psychiatric prescriber. (*Id.*) She discussed the "dysfunctional relationship" with her mother and stated the she was in court for violating a temporary protective order placed by her mother.

14

(*Id.*) She also discussed the abuse her mother committed when she was younger. (*Id.*) She reported that her mother had called the police "over 30 times" to do a wellness check on her. (*Id.*)

At a February 14, 2021, telehealth counseling appointment, Ms. McMullen reported that she was due in court for violation of a protection order, and that she was potentially facing jail time. (Tr. 547.) She stated that she believed her provider should increase her Seroquel. (*Id.*) Mental status examination findings from February 15, 2021, revealed Ms. McMullen was alert with self-reported poor, "spaced out" concentration; had depressed mood with anxiety; had normal language and speech; had obsessive and tangential thought process; had loose associations; had normal memory; had limited insight; had fair judgment; and denied hallucinations delusions, and suicidal or homicidal ideations. (Tr. 951-52.) Her diagnoses were generalized anxiety disorder, adjustment disorder with depressed mood, PTSD, and other psychosocial and environmental problems. (Tr. 953.) On February 28, 2021, Ms. McMullen stated that her provider increased her Seroquel for anxiety, but she was experiencing side effects such as dry mouth and reported disturbed sleep. (Tr. 557.)

At a March 5, 2021, appointment, Ms. McMullen reported anxiety related to COVID-19, not leaving the house, continued conflicts with her family, and extreme dry mouth and restless leg syndrome from increased Seroquel. (Tr. 694.) Her provider planned on decreasing her Seroquel. (Tr. 695.) On March 7, 2021, Ms. McMullen told Ms. Kelly that her mind "keeps going back to [her] childhood." (Tr. 701.) Ms. McMullen stated that her mother told her she was never wanted and should have been given up for adoption. (*Id.*) Ms. McMullen stated that she has been trying to gain her mother's acceptance for her entire life. (*Id.*) At another counseling appointment in March 2021, Ms. McMullen discussed that her daughter's boyfriend had been abusing her daughter. (Tr.

687.) (Tr. 687.) Mental status exam results from March 8, 2021, indicated that Ms. McMullen was cooperative; had appropriate affect; and had normal speech and language. (Tr. 821.)

Ms. McMullen was involved in a car accident in March 2021, which resulted in neck pain, shoulder pain, and intermittent numbness in her bilateral arms. (Tr. 1257-58.) On April 2, 2021, Ms. McMullen saw Dr. Shah for a follow-up from this accident. (Tr. 1255.) She reported that she was still experiencing right shoulder and arm pain, as well as pain that goes up into her neck. (Tr. 1256.) She stated that Tizanidine provided minimal relief, and she was unable to lift her right arm up above her head. (*Id.*) She also reported that she had a hard time getting dressed. (*Id.*) Physical examination results revealed that Ms. McMullen had lungs clear to auscultation, right shoulder that was tender across the entire right clavicle out of proportion to examination, limited range of motion in her right shoulder, and bilateral tender cervical muscles. (*Id.*) The exam results also indicated Ms. McMullen was alert and in no acute distress. (*Id.*)

Ms. McMullen returned to Dr. Shah on May 13, 2021, with complaints of severe pain from her low back up to her right shoulder and right-sided tenderness, which started after her landlord kicked in a door and hit her while she was standing behind her door taking a video. (Tr. 1250-51.) Ms. McMullen walked with a limp due to back pain. (*Id.*) Upon examination, Ms. McMullen had midline lumbar back pain, severe decreased extension and flexion due to pain, diffuse paravertebral muscle spasm, and bilateral shoulder severe diffuse tenderness to palpation. (Tr. 1250.) She had full range of motion, but Dr. Shah noted it was "very slow." (*Id.*) Ms. McMullen also demonstrated full, five out of five strength in her bilateral upper and lower extremities. (*Id.*) Dr. Shah assessed Ms. McMullen with injury, pain in both lower extremities, chronic bilateral low back pain without sciatica, and bilateral shoulder pain. (*Id.*) X-rays of Ms. McMullen's lumbar

spine from May 18, 2021, showed that Ms. McMullen had only very mild multilevel degenerative disc disease. (Tr. 1315.)

A June 13, 2021, EMG of Ms. McMullen's right upper and lower extremities showed no evidence of neuropathy or radiculopathy. (Tr. 981, 1001-02.) At a visit on June 25, 2021, treatment notes listed Ms. McMullen's visit diagnoses as fibromyalgia and chronic pain syndrome. (Tr. 974.) She complained of chronic, widespread pain, low back pain with radicular symptoms suggesting claudication, chronic distal symptoms in the legs reminiscent of polyneuropathy, and underlying anxiety. (Tr. 979.) Dr. Thakore noted that there was no evidence of nerve damage or neuropathy upon testing. (Tr. 981.) Dr. Thakore further noted Ms. McMullen had not had an in-person neurological examination, only a video examination, and that it would be reasonable to complete an in-person examination to be "more certain that neurological disease is excluded." (*Id.*) He opined that she likely had fibromyalgia syndrome. (*See id.*) At a June 21, 2021, telephone appointment, Ms. McMullen reported that she had an ongoing issue with numbness in her legs. (Tr. 1084.)

On June 28, 2021, Ms. McMullen attended a psychiatric follow-up telephone appointment with Nurse Flynn. (Tr. 2121.) She reported that it had been a "chaotic few months", and she went to the emergency room for anxiety. (Tr. 2121-22.) The mental status exam revealed Ms. McMullan had "generally poor" health appearance, rapid speech, full affect, anxious mood, cooperative and anxious demeanor, unremarkable perception, limited insight, impaired judgment, and grossly intact memory. (Tr. 2122-23.) She was also alert and fully oriented. (*Id.*)

Ms. McMullen attended telehealth appointments in July 2021 where she reported symptoms stemming from her fibromyalgia. She stated that it felt as if every bone in her body was broken, and that the bottom of her feet felt like pins, needles, tingling, and burning. (Tr. 1228.)

She reported that her muscles felt like they were aching and tearing, and ice, heating pads, and showers provided minimal relief. (Tr. 1380.) On July 19, 2021, Dr. Shah prescribed a course of steroids due to Ms. McMullen's complaints of whole body aches, but he did not perform an examination. (*Id.*) On August 30, 2021, Dr. Shah prescribed Ms. McMullen a NSAID after Ms. McMullen complained that her bones were hurting. (Tr. 1370.)

On September 21, 2021, Ms. McMullen reported a decreased appetite and difficulties falling and staying asleep. (Tr. 2120.) She also endorsed days of less need for sleep, racing thoughts, flights of ideas, feeling more talkative, euphoria, and irritability "in the past.". (*Id.*) The mental status examination revealed Ms. McMullen had unremarkable speech; flat affect; depressed, worried, anxious, and sad reported mood; appropriate and cooperative demeanor; unremarkable thought content with depressive cognitions, appropriate insight; appropriate judgment; and grossly intact memory. (Tr. 2119.) She also was alert and fully oriented. (*Id.*)

On September 10, 2021, Ms. McMullen endorsed depression symptoms, including hopelessness, loss of interest, worthlessness, restlessness, fatigue/no energy, inattention, sleeping too little, poor self-esteem, irritability, lack of motivation, and insomnia. (Tr. 2116.) She also reported anxiety symptoms that included nervousness, uneasiness, restlessness, fearfulness, worry, becoming easily fatigued, poor concentration, sleep problems, racing thoughts, and difficulty focusing. (*Id.*) She further reported mania symptoms such as inflated self-esteem, less need for sleep, racing thoughts, euphoria, flight of ideas, distractibility, increased talkativeness, and irritability. (*Id.*) Her mental status exam revealed unremarkable speech; flat affect; reported depressed, worried, anxious and sad mood; appropriate demeanor; unremarkable thought content with depressive cognitions; unremarkable thought process; unremarkable perception; appropriate

insight; appropriate judgment; and grossly intact memory. (Tr. 2119.) Ms. McMullen was also alert and fully oriented. (*Id.*)

On September 17, 2021, Ms. McMullen reported that trauma symptoms were "hindering [her] from living a normal life." (Tr. 2113.) She reported intrusive memories and thoughts, and said that hypervigilance and a low stress threshold were negatively impacting her relationships with her children and grandchildren. (Tr. 2114.) She felt she did not benefit from her past therapy experience. (*Id.*) Her mental status exam revealed anxious behavior; rapid speech; nervous and anxious mood; appropriate affect; unremarkable perception; appropriate insight; and appropriate judgment. (*Id.*)

On September 21, 2021, Ms. McMullen reported a situation where she "flipped out" and threatened a deli worker. (Tr. 2112.) She endorsed flashbacks multiple times a day and reported memory loss over how to do simple things like open a jar and crochet. (*Id.*) Mental status exam revealed unremarkable speech; neutral mood; appropriate affect; unremarkable thought content; unremarkable perception; appropriate insight; and appropriate judgment. (*Id.*)

Ms. McMullen attended a telephone psychiatric evaluation and medication management appointment on September 28, 2021 with Nicole Pavella, A.P.N. (Tr. 2103.) She denied any side effects of her medications. (Tr. 2104.) She described her mood as "I take one day at a time, but I[']m depressed and mood swings are pretty bad"; her motivation as "beyond low"; and her concentration as "I can't." (Tr. 2104.) She endorsed feelings of guilt, anhedonia, anger, and panic. (*Id.*) Her current stressors were COVID-19, COVID-19's effects, and her life generally. (*Id.*) She denied audiovisual hallucinations but also stated that she "sometimes feel[s] like [she] can hear people talking to [her] and [she] make[s] sure [she] sleep[s] with [her] door closed at night." (*Id.*) Nurse Pavella noted that Ms. McMullen was rambling and hyperverbal, and that Ms. Pavella

reported irritability. (*Id.*) Her mental status examination revealed appropriate appearance, unremarkable speech, full affect, reported anxious mood, appropriate demeanor, unremarkable thought content and process, appropriate insight, appropriate judgment, and grossly intact memory. (Tr. 2107-08.) She was also alert and fully oriented. (Tr. 2107.) Nurse Pavella prescribed medications. (Tr. 2108-09.)

On November 18, 2021, Ms. McMullen reported "very depressed and irritable" mood; poor appetite with weight loss; poor sleep; horrible concentration; and no motivation. (Tr. 2096.) Mental status examination revealed rapid speech; full affect; depressed, anxious, and irritated mood; appropriate, expansive, and tearful demeanor; unremarkable thought process; unremarkable perception; thought contention with depressive cognitions; limited insight; fair judgment; and grossly intact memory. (Tr. 2097.)

On November 22, 2021, Ms. McMullen had a virtual health appointment with Dr. Shah. She reported she was "bed bound" and unable to do anything. (Tr. 1474.) Upon examination, Ms. McMullen was "well-appearing," alert, in no acute distress, well-hydrated, and well-nourished. (*Id.*) Her lungs were clear to auscultation, but she had diffuse severe tenderness to touch all over her body. (*Id.*) Dr. Shah prescribed a different nerve pain medication. (*Id.*)

Treatment notes from December 20, 2021, indicate that Ms. McMullen reported pain all over her body, including her joints and muscles, which she said flared after receiving the COVID-19 vaccine. (Tr. 1429.) She stated that she felt some improvement with gabapentin and Lyrica. (*Id.*)

On December 23, 2021, Ms. McMullen stated that her concern was that her anxiety was "through the roof" and her depression was "crazy." (Tr. 2082.) She reported depressed mood, decreased appetited, low motivation, and "not good concentration." (*Id.*) Ms. McMullen endorsed

feelings oof guilt, anhedonia, anger, and panic. (*Id.*) She stated that her current stressors were her medical conditions. (*Id.*)  Her mental status exam revealed rapid speech; full affect; depressed and anxious reported mood; expansive demeanor; thought content with depressive cognitions but no suicidal or homicidal ideations; goal-directed and "perseveration" thought process; perception described as "hallucinations"; fair insight; fair judgment; and grossly intact memory. (Tr. 2083-84.) Ms. McMullen was also alert and fully oriented. (Tr. 2084.)

On December 27, 2021, Ms. McMullen reported to Nurse Pavella with increased depression and some visual hallucination of people standing in her room, as well as auditory hallucinations of "voice[s] chattering in the background." (Tr. 2088.) She also stated that her anxiety was "through the roof." (*Id.*) She reported that she was taking her medications daily, experienced no side effects from this medication, and that her medications were working "OK" for her. (*Id.*) Mental status examination revealed anxious behavior, unremarkable speech, neutral mood, appropriate affect, and thought content with depressive cognitions. (Tr. 2089.) For the perception finding, Nurse Pavella wrote that Ms. McMullen reported auditory and visual hallucinations. (*Id.*)

X-rays of Ms. McMullen's lumbar spine from January 2022 showed minimal degenerative changes. (Tr. 2144.) The x-rays of her sacroiliac joints were also normal. (*Id.*)

Mohamed Alalwani, M.D., evaluated Ms. McMullen on January 11, 2022, for complaints of back pain and joint pain. (Tr. 2133-38.) Dr. Alalwani observed tenderness of multiple joints with normal range of motion, tenderness in the low back and hips, and multiple tender points. (Tr. 2133, 2137-38.) Ms. McMullen had normal strength in her arms and legs, intact sensation, and normal range of motion in her neck and low back. (Tr. 2137.) Her respiratory examination was normal. (*Id.*)

Toni Wilcox, APRN-CNP, evaluated Ms. McMullen on January 13, 2022. (Tr. 2150.) Ms. McMullen reported that her thoracic and lumbar back pain had gotten worse. (*Id.*) She stated she is practically bed bound due to pain. (*Id.*) She described the pain as sharp, throbbing, burning, and continuous without radiation to buttocks, and the pain becomes worse with movement, rotation, and standing. (*Id.*) Upon examination, Ms. McMullen was alert, cooperative, and in no distress. (Tr. 2152.) Her neck was normal. (*Id.*) Her lungs were also clear to auscultation. (Tr. 2152.) There was tenderness to palpation over lumbar spinous process. (*Id.*) Her muscle strength was 5/5 throughout her body. (*See id.*) Sensation was normal throughout her body as well. (*Id.*) Nurse Wilcox diagnosed Ms. McMullen with chronic low back pain. (*Id.*)

On February 2, 2022, Nurse Pavella noted that Ms. McMullen exhibited moderate difficulty in managing intense emotions, but also assessed McMullen's intent to harm as low. (Tr. 2067.) The mental status exam findings revealed irritable, threatening, expansive, and grandiose behavior; loud speech; angry mood; labile affect; unremarkable thought content; appropriate insight; and appropriate judgment. (*Id.*)

On February 15, 2022, Brendan Astley, M.D., evaluated Ms. McMullen. Ms. McMullen reported her lumbar and hip pain had gradually worsened. (Tr. 2160.) She described her pain as sharp, intense, continuous, and chronic, without radiation to arms, legs, or buttocks and without pain in the left buttock area. (*Id.*) She reported that the pain comes down her legs to her feet, more on the left than the right. (*Id.*) She reported she is crawling up and down her steps at home at times due to the pain. (*Id.*) She stated that she feels like her spine and feet are "grinding a lot of the time," and that her lumbar spine feels like "someone is trying to pry [it] apart with a screwdriver at times." (*Id.*) Upon examination, Ms. McMullen was alert, cooperative, and in no distress. (Tr. 2161.) Her neck was supple. (*Id.*) Her lungs were clear to auscultation. (*Id.*)  There was tenderness to palpation

over paraspinal muscles in the painful area. (Tr. 2162.) Dr. Astley administered a trigger point injection into the left side of Ms. McMullen's low back, continued the NSAID, reinforced the importance of back protection and a regular program of improving strength and flexibility, and advised Ms. McMullen to start infusion therapy when possible. (*Id.*)

## IV.    THE ALJ'S DECISION

The ALJ first determined that Ms. McMullen met the insured status requirements of the Social Security Act through June 30, 2021. (Tr. 20.) The ALJ then determined Ms. McMullen has not engaged in substantial gainful activity since January 16, 2020, the alleged disability onset date. (*Id.*) The ALJ found that Ms. McMullen had the following severe impairments: spine disorders, asthma, peripheral neuropathy, anxiety, post-traumatic stress disorder (PTSD), and depressive disorder. (Tr. 21.) However, the ALJ found that none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 22-25.)

The ALJ determined that Ms. McMullen could perform work at the light exertional level, except she can frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; frequently kneel, crouch, or crawl; occasionally stoop; can perform unlimited balancing; must avoid ventilations; can perform short cycle tasks at a consistent pace in a setting where she is not expected to meet strict production demands or concentrate for extended periods; can interact with others superficially on an occasional basis; and can work within a set routine where major changes are explained in advance and gradually implemented to allow her time to adjust to the new expectations. (Tr. 25.) The ALJ further added that Ms. McMullen's ability to handle routine stress and pressure in the workplace would be reduced, but adequate to handle tasks without strict time limitations or strict production standards. (*Id.*)

## V.    LAW & ANALYSIS

### A.  *Substantial Evidence Supports the ALJ's Assessment of Nurse Pavella's Opinion and the ALJ's Adoption of the State Agency Experts' Opinions.*

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how she considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2).[4]

According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520(c)(1)-(2).

The ALJ appropriately determined that Nurse Pavella's opinion was a checkbox form. As a general matter, an ALJ may properly afford little weight to a medical source's checkbox form of functional limitations when it does not cite clinical test results, observations, or other objective findings. *Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 567 (6th Cir. 2016) (collecting cases). In the instant case, Nurse Pavella checked boxes regarding Ms. McMullen's limitations. (Tr. 1411-12.) Then, in terms of explanation, Nurse Pavella merely wrote that Ms. McMullen "is d[iagnosed] with PTSD, GAD, bipolar [disorder], panic [disorder], and agoraphobia. Many of these d[iagnoses]

---

[4] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 404.1520c(c)(3)-(5).

are based off of p[atient's] reported symptoms that she has been unable to manage thus far which has been reportedly debilitating." (Tr.1413.) Nurse Pavella then stated that Ms. McMullen has a diagnosis of "chronic pain which worsens mental disorders." (*Id*.) Nurse Pavella's statements offer little, if any, explanation and does not citeto any supporting objective medical evidence for the extent of her opined limitations.

Although Ms. McMullen argues that Nurse Pavella's statements constitute adequate explanation, courts in the Northern District of Ohio have concluded that forms with similar explanations were checkbox forms. *See, e.g.*, *Kreilach v. Comm'r of Soc. Sec.*, 621 F.Supp.3d 836, 848 (N.D. Ohio Aug. 15, 2022) (finding that medical source's questionnaires were checkbox forms where the medical sources "checked boxes and wrote cursory statements about the supporting clinical findings and [p]laintiff's prognosis"); *Duke v. Comm'r of Soc. Sec.*, No. 21 CV 39, 2022 WL 1075171, at *4 (N.D. Ohio Apr. 11, 2022) (finding that medical source's form was a checkbox form where the form included checkboxes and listed claimant's asthma and POTS diagnoses; described treatment as "medications;" listed symptoms; and stated that the medical findings were a "fast heart rate and low blood pressure."); *Martin v. Berryhill*, No. 5:18-cv-924, 2019 WL 4194178, at * (N.D. Ohio Sept. 4, 2019) ("The inclusion of a diagnosis alone, however, does not save a patently deficient medical source opinion.").

To the extent that Ms. McMullen is arguing that Nurse Pavella's statement that Ms. McMullen's diagnoses are based on Ms. McMullen's "reported symptoms that she has been unable to manage" and were "reportedly debilitating" constitutes sufficient explanation, this argument is not well-taken. (Tr. 1413.) Nurse Pavella's statement offers no explanation as to the frequency or severity of these symptoms or how they would impact Ms. McMullen's ability to sustain work activity. (Tr. 1411-13.) Finally, Ms. McMullen points to treatment notes that she contends back

this opinion, but there is no reference to these notes in Nurse Pavella's opinion. (*See generally* Tr. 1411-13.)

Thus, the ALJ's observation that Nurse Pavella's opinion was a checkbox form was an articulation of the supportability factor. As stated above, supportability is one of the factors the regulations specify to evaluate opinion evidence, and the regulations state that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinions…the more persuasive the medical opinions will be." 20 C.F.R. § 404.1520c(c)(1).

The checkbox form was not the only reason that the ALJ articulated for supportability. In fact, the ALJ also observed that Nurse Pavella's opinion "appear[ed] to be based on [Ms. McMullen's] subjective complaints rather than on objective findings." (Tr. 33.) In support, the ALJ pointed to a February 2021 mental status examination findings where Ms. McMullen was alert and in no acute distress, had normal memory, limited insight, and fair judgment. (Tr. 33; *see* Tr. 951-52.) I first note that a portion of Ms. McMullen's argument also substantively relies on her subjective reports rather than objective findings. (ECF No. 7, PageID#2208-314 (citing Tr. 326, 456, 496, 501, 531, 536, 557, 665, 2088, 2112, 2116).) And Ms. McMullen's other cited evidence does not demonstrate that the ALJ's statements regarding her memory and judgment were in "direct conflict." (ECF No. 7, PageID#2209-10.)

Specifically, Ms. McMullen relies on her subjective reports to her provider that she had "memory loss over how to do simple things like open a jar and crochet" to argue this was in "direct conflict" to the ALJ's conclusion that Ms. McMullen's memory was normal. (ECF No. 7, PageID#2209 (citing Tr. 2112).) Yet, this statement was Ms. McMullen's report to her provider; it was *not* derived from the provider's mental status examination. (Tr. 2112 ("[Ms. McMullen]

*[r]eports* memory loss such as forgetting how to use a sewing machine, open a jar, crochet, etc that will disappear for several weeks and return.")(emphasis added). Indeed, the provider's mental status examination makes *no* finding regarding Ms. McMullen's memory.

Moreover, the other mental status examination findings from the treatment notes Ms. McMullen relies upon regarding her subjective reports actually cut against her argument that the evidence is in "direct conflict" with the ALJ's statement that her judgment was "fair." (*See* ECF No. 7, PageID#2209 (citing Tr. 2122.)) In fact, the same mental status examination indicates that Ms. McMullen had neutral mood with appropriate affect, unremarkable thought content and perception, and appropriate insight and judgment. (Tr. 2112.) And while Ms. McMullen points to one instance in the record where it was observed that she had impaired judgment, there are numerous other mental status examination findings that reflect fair to appropriate judgment. (*See, e.g.*, Tr. 608, 614, 620, 627-28, 634-35, 641-42, 648-49, 655-56, 662-63, 669-70, 676-77,2071, 2084, 2097, 2107.)

Next, the ALJ addressed the consistency factor. In the instant case, the ALJ determined that other mental status examination findings did not support these limitations. Specifically, the ALJ referenced a February 2021 treatment note where a medical provider observed that Ms. McMullen was alert and in no acute distress, and had normal memory, limited insight, and fair judgment. (Tr. 33; *see* Tr. 951-52.) Ms. McMullen argues that the ALJ's analysis was error because he merely relied on one treatment note when the "totality of evidence actually indicates a plethora of support for these findings." (ECF No. 7, PageID#2208-10.) Ms. McMullen thus contends that the ALJ failed to consider these findings and only relied on findings that supported his analysis, *i.e.*, "cherry-picking" of the record. I disagree.

As a preliminary matter, Ms. McMullen's cherry-picking argument is not well-taken. "The problem with a cherry-picking argument is that it runs both ways. [Ms. McMullen] argues the ALJ only focused on the positive, whereas [her] brief emphasizes the negatives. Crediting [Ms. McMullen's] argument here would require the Court to re-weigh evidence—which it cannot do." *Colvin v. Comm'r of Soc. Sec.*, No. 5:18 CV 1249, 2019 WL 3741020, at *14 (N.D. Ohio May 8, 2019). Instead, Ms. McMullen must show that the ALJ's decision is not supported by substantial evidence. "[A] claimant does not establish a lack of substantial evidence by pointing to evidence of record that supports her position. Rather, [the claimant] must demonstrate that there is not sufficient evidence in the record that would allow a reasoning mind to accept the ALJ's conclusion." *Greene v. Astrue*, No. 1:10-cv-0414, 2010 WL 5021033, at *4 (N.D. Ohio Dec. 3, 2010.)

Here, Ms. McMullen relies on her subjective reports to her provider that she had "memory loss over how to do simple things like open a jar and crochet," and her endorsement of symptoms of inattention, poor concentration, racing thoughts, and difficulty focusing as support of "direct conflict" for the ALJ's conclusion that her memory was normal. (ECF No. 7, PageID#2209 (citing Tr. 2112, 2116.)) Yet, these were subjective reports to her provider, *not* mental status examination findings. (Tr. 2112 ("[Ms. McMullen] [r]eports memory loss such as forgetting how to use a sewing machine, open a jar, crochet, etc that will disappear for several weeks and return"); Tr. 2116 (endorsing symptoms such as inattention, poor concentration, racing thoughts, and difficulty focusing.)[5]). Indeed, in the same visit where Ms. McMullen reported memory loss, the medical provider made *no* finding regarding her memory. (Tr. 2112.) Rather, the mental status examination indicates that Ms. McMullen had neutral mood with appropriate affect, unremarkable thought

---

[5] Notably, despite reporting symptoms of inattention, the same assessment inconsistently notes that Ms. McMullen also did not report any symptoms related to attention. (Tr. 2116.)

content and perception, and appropriate insight and judgment. (*Id.*) These same findings also cut against her argument that the evidence is in "direct conflict" with the ALJ's statement that her judgment was fair." (*See* ECF No. 7, PageID#2209 (citing Tr. 2122.) Further, there are other mental status examination findings that reflect fair to appropriate judgment and grossly intact memory. (*See, e.g.*, Tr. 608, 614, 620, 627-28, 634-35, 641-42, 648-49, 655-56, 662-63, 669-70, 676-77, 1453-54, 2067, 2071, 2076, 2078, 2080, 2084, 2092, 2094, 2097, 2101, 2107, 2112, 2114, 2119.)

Importantly, although the ALJ did not cite the evidence upon which Ms. McMullen relies, the ALJ's decision was not bereft of Ms. McMullen's unfavorable subjective reports. (*See generally* Tr. 30-32.) However, the ALJ concluded that other findings do not support Nurse Pavella's opinions. The fact that Nurse Pavella's opinion was consistent with certain findings in the record (*e.g.*, subjectively reported poor concentration, depressed mood, anxiety, obsessive and tangential thought process, and loose associations) does not render the ALJ's analysis incorrect. (*See* ECF No. 7, PageID#2211.) So long as the ALJ followed the regulations and supported his decision with substantial evidence, a reviewing court will not remand a decision simply because there is evidence supporting the opposite conclusion. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997) ("Even if the evidence could also support another conclusion, the decision of the [ALJ] must stand if the evidence could reasonably support the conclusion."). The Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)). Despite the evidence Ms. McMullen highlights, the ALJ's decision is supported by substantial evidence.

Ms. McMullen also maintains that the ALJ erred by adopting limitations in addition to those found by the state agency consultants, arguing that the ALJ's reasoning was inconsistent because he criticized Nurse Pavella's reliance on Ms. McMullen's subjective complaints, but the ALJ then imposed greater limitations than found by the state agency consultants based only on Ms. McMullen's subjective complaints. (ECF No. 7, PageID#2212.) While the ALJ deemed the state agency opinions persuasive "because they are consistent with the medical evidence of record and the medical consultants are informed by program knowledge," (Tr. 33) the ALJ also added additional limitations to "account for [Ms. McMullen's] *most recent treatment* and subjective complaints." (*Id.* (emphasis added)) Thus, Ms. McMullen does not establish that the ALJ erred. Accordingly, I recommend that the Court reject this assignment of error because it lacks merit.

### B. *Substantial Evidence Supports the ALJ's Evaluation of Ms. McMullen's Subjective Complaints.*

Ms. McMullen contends that the ALJ did not develop an "accurate and logical bridge" between the evidence and his conclusions. (ECF No. 7, PageID#2212-15.) She asserts that the medical records "consistently detail significant pain complaints and limitations." (*Id.* at PageID#2214 (citing Tr. 374, 390, 1042, 1204, 1228, 1380, 1453.)) She states that the ALJ failed to explain why Ms. McMullen's statements and these accompanying records were inconsistent and only partially credible. (*Id.* at PageID#2215.) For the following reasons, I disagree.

Evaluating an individual's subjective symptoms is a two-step process. SSR 16-3p, 2017 WL 5180304, at *3. First, the ALJ must consider whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* Then, the ALJ must evaluate the intensity and persistence of the individual's symptoms and determine the extent to which they limit the individual's ability to perform work-related activities.

*Id.* At the second step, the ALJ may consider evidence directly from the claimant, or gleaned from other medical and non-medical sources, such as family and friends. *Id.*

An ALJ must consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including the daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ must also determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.*

An ALJ is not required to accept a claimant's subjective complaints, *Jones v. Comm'r of Soc. Sec.*, 336 F. 3d 469, 476 (6th Cir. 2003), and need not "make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). But the regulations require the ALJ to evaluate a claimant's symptoms, and the explanation must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007); *see also* SSR 16-3p, 2017 WL 5180304, at *10.

The ALJ does not need to use any "magic words," so long as it clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617-JDG, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021). The ALJ's evaluation of subjective evidence receives great deference from a reviewing court. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). Absent

compelling reason, a court may not disturb the ALJ's analysis of the claimant's subjective complaints, and the conclusions drawn from it. *Id*. (internal quotations and citations omitted).

Albeit brief, the ALJ provided sufficient reasoning demonstrating why Ms. McMullen's alleged symptom severity was inconsistent and only partially credible. Ms. McMullen's assertion that the ALJ did not include an explanation as to how the record evidence is inconsistent with her complaints is inaccurate. For example, the ALJ compared the objective findings and the record evidence, which did demonstrate inconsistencies. Significantly, the ALJ observed that Ms. McMullen reported that her feet feel "broke" and like she is "walking on softballs," but noted her examinations revealed normal gait without the use of an ambulatory aid. (Tr. 33.) The record supports this point. (*See* Tr. 322, 1285, 1454.) The ALJ noted that Ms. McMullen's examinations revealed normal strength in her legs. (Tr. 33; *see, e.g.*, Tr. 1250, 2152.) Regarding Ms. McMullen's asthma, the ALJ observed that Ms. McMullen was not hospitalized for an asthma exacerbation. (Tr. 33; *see* Tr. 382.) Further, the ALJ also noted that Ms. McMullen's examinations showed that her lungs were clear to auscultation. (Tr. 33; *see* Tr. 329, 1250, 2160, 2162.)

The ALJ then discussed Ms. McMullen's medication regimen and noted the lack of evidence demonstrating side effects that would interfere significantly with her ability to perform work within the RFC. (Tr. 34); *see* 20 C.F.R. § 404.1529(c)(3)(iv). And as the ALJ concluded, and Ms. McMullen does not demonstrate otherwise, no treating source "refers to the claimant or debilitating symptoms that would prevent her from returning to the workplace at a reduced level of exertion such as in the performance of light work or has otherwise described the claimant as 'totally and permanently disabled' by her impairments and complaints." (Tr. 34); *see* 20 C.F.R. § 404.1529(c)(3)(vii).

Although Ms. McMullen points to evidence that supports a different interpretation (*i.e.*, that her conditions cause pain that impact her mental conditions), this argument constitutes an alternative interpretation of the evidence. But the evidence does not demonstrate a basis for a remand because Ms. McMullen has the burden to demonstrate that no reasonable person could have reached a different conclusion. *Fleischer*, 774 F.Supp.2d 875. She fails to meet this burden. (ECF No. 7, PageID#2212-15.) The ALJ's decision reflects that he presented clear, sufficient reasons for why Ms. McMullen's symptoms were not consistent with the record, which built an "accurate and logical bridge" between the evidence of record and the result. *Fleischer*, 774 F. Supp. 2d at 877. Accordingly, I recommend that the Court reject this assignment of error because it lacks merit.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated: December 11, 2023                              s/ *Jennifer Dowdell Armstrong*
                                                     Jennifer Dowdell Armstrong
                                                     U.S. Magistrate Judge

## VII.   NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those

portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d 505). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).